1

2

3

4

5

6

7

8               UNITED STATES DISTRICT COURT

9               EASTERN DISTRICT OF CALIFORNIA

10

11  KLAMATH-SISKIYOU WILDLANDS              No. 2:11-cv-00439-MCE-JFM
    CENTER, et al.,
12
                    Plaintiffs,
13
            v.
14                                          **MEMORANDUM AND ORDER**
    PATRICIA A. GRAHAM, et al,
15
                    Defendants.
16

17

18         Through the present action, Plaintiffs Klamath-Siskiyou Wildlands Center,

19  Wildlands Center for Preventing Roads, Environmental Protection Information Center,

20  Wilderness Society and Klamath Forest Alliance (hereinafter "Plaintiffs") seek

21  declaratory and injunctive relief from the adoption by Defendants United States Forest

22  Service ("Forest Service") and Patricia A. Grantham, Klamath National Forest

23  Supervisor, (hereinafter "Defendants") of the Record of Decision ("ROD") approving the

24  Klamath National Forest Motorized Travel Management Environmental Impact

25  Statement.

26  ///

27  ///

28  ///

1

1  Plaintiffs contend that the Final Environmental Impact Statement ("FEIS") issued by the

2  Forest Service in August of 2010 violates the provisions of the National Environmental

3  Policy Act, National Forest Management Act, and Clean Water Act.  Presently before the

4  Court are the parties' cross-motions for summary judgment.[1]  For the reasons set forth

5  below, Plaintiffs' motion is DENIED and Defendants' motion is GRANTED in its entirety.

6

7  **BACKGROUND**

8  A.  **Statutory Framework**

9      1.  **National Environmental Policy Act**

10

11     Congress enacted the National Environmental Policy Act ("NEPA") in 1969 to

12  protect the environment by requiring certain procedural safeguards before an agency

13  takes action affecting the environment.  The NEPA process is designed to "ensure that

14  the agency . . . will have available, and will carefully consider, detailed information

15  concerning significant environmental impacts; it also guarantees that the relevant

16  information will be made available to the larger [public] audience."  Blue Mountains

17  Biodiversity Project v. Blackwood, 161 F.3d 1208, 1212 (9th Cir. 1998) (quoting

18  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989)).  The purpose

19  of NEPA is to "ensure a process, not to ensure any result."  Inland Empire Pub. Lands

20  Council v. U.S. Forest Serv., 88 F.3d 754, 758 (9th Cir.1996).  "NEPA emphasizes the

21  importance of coherent and comprehensive up-front environmental analysis to ensure

22  informed decision-making to the end that the agency will not act on incomplete

23  information, only to regret its decision after is it too late to correct."  Center for Biological

24  Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1166 (9th Cir. 2003).  Complete analysis

25  under NEPA also assures that the public has sufficient information to challenge the

26  agency's decision.  Methow Valley Citizens Council, 490 U.S. at 349.

27  _____

28      [1] Because oral argument will not be of material assistance, the Court orders this matter submitted on the briefs.  E.D. Cal. Local Rule 230(g).

2

NEPA mandates that all federal agencies, including the Forest Service, prepare a "detailed statement" that discusses the environmental ramifications and alternatives to all "major Federal Actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  These statements must include a description and analysis of the environmental impact of the proposed action, any adverse environmental effects that cannot be avoided if the action is implemented, alternatives to the proposed action, the relationship between short-term uses and long-term productivity, and any irreversible or irretrievable commitment of resources that would be involved if the action were to be implemented.  Id.; Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147, 1153 (9th Cir. 2006).  "In short, NEPA requires that a federal agency 'consider every significant aspect of the environmental impact of a proposed action' and 'inform the public that it has indeed considered environmental concerns in its decision-making process.'"  Id. (quoting Kern v. U.S. Bureau of Land Mgmt., 284 F.3d 1062, 1066 (9th Cir. 2002)).  Thus, an agency must take a "hard look" at the consequences, environmental impacts, and adverse environmental effects of a proposed action within an environmental impact statement.  Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976).  If an environmental impact statement adequately discloses such effects, NEPA's goal is satisfied.  Inland Empire Pub. Lands Council, 88 F.3d at 758.

**2. National Forest Management Act and Northwest Forest Plan**

In 1976, Congress enacted the National Forest Management Act ("NFMA"), 16 U.S.C. §1600 et seq., which governs the Forest Service's management of national forests.  The NFMA imposes both procedural and substantive requirements on the Forest Service's management of national forests.  Hapner v. Tidwell, 621 F.3d 1239, 1246 (9th Cir. 2010).  The Service's procedural responsibilities under the NMFA include development and maintenance of a comprehensive Land and Resource Management Plan ("LRMP") for each national forest.

1    16 U.S.C. § 1604(a); Hapner, 621 F.3d at 1246.  In developing and maintaining each

2    plan, the Forest Service is required to use "a systematic interdisciplinary approach to

3    achieve integrated consideration of physical, biological, economic, and other sciences."

4    16 U.S.C. § 1604(b).  Once a forest plan is adopted, all subsequent agency actions must

5    comply with that plan.  Id. § 1604(i); Hapner, 621 F.3d at 1246.  The Forest Service

6    should examine the proposed project's compliance with the applicable forest plant during

7    the NEPA process.  Center for Sierra Nevada Conservation v. U.S. Forest Serv., 832 F.

8    Supp. 2d 1138, 1142 (E.D. Cal. 2011) (citing Inland Empire Pub. Lands Council, 88 F.3d

9    at 757).

10       In 1994, the Forest Service and the Bureau of Land Management adopted the

11   Northwest Forest Plan ("NWFP") to provide a regional strategy for managing the

12   National Forests of Northern California, Oregon and Washington for ecological and

13   socio-economic benefits.  See AR[2] 18281-18511.  The NWFP establishes a system of

14   land "allocations," including Late Successional Reserves ("LSR"), Adaptive Management

15   Areas, and Riparian Reserves.  Id. at 18289.  Each land allocation is governed by a

16   different set of Standards and Guidelines ("S&Gs").  However, some S&Gs apply to all

17   land allocations.  Id. at 18410.

18       In addition to the land allocations, the NWFP created the Aquatic Conservation

19   Strategy ("ACS") to restore and maintain the ecological health of watersheds and aquatic

20   ecosystems contained within them on public lands.  Id. at 18383.  The nine Aquatic

21   Conservation Strategy Objectives require the Forest Service to "maintain and restore"

22   key aquatic and watershed processes.  Id. at 18385.

23   ///

24   ///

25   ///

26   ///

27   _____

28       [2] Unless otherwise indicated, all citations to the administrative record lodged with the Court will be
specified as "AR".

1

2

### 3.    Clean Water Act

The stated purpose of the Clean Water Act ("CWA) is to restore and maintain the chemical, physical and biological integrity of the Nation's waters.  33 U.S.C. § 1251(a).  "The CWA requires federal agencies to determine that approved actions do not result in pollution in violation of state water quality standards."  Greater Yellowstone Coal. v. Lewis, 628 F.3d 1143, 1149 (9th Cir. 2010) (citing 33 U.S.C. § 1323(a)).  To achieve its statutory objectives, the CWA authorized each state to develop water quality standards for all waters within its boundaries.  33 U.S.C. §§ 1311(b)(1)(C), 1313.  "A water quality standard defines the water quality goals of a water body, or portion thereof, by designating the use or uses to be made of the water and by setting criteria necessary to protect the uses."  40 C.F.R. § 131.2.  Water quality standards also prevent further degradation of that water body with "antidegradation" provisions.  Id. § 131.12.

States identify impaired waters that do not meet water quality standards and "establish a priority ranking for such waters, taking into account the severity of the pollution and the uses to be made of such waters."  33 U.S.C. § 1313(d)(1)(A).  States periodically submit lists of such impaired waters to EPA as the "303(d) list," and must develop a "total maximum daily load" ("TMDL") for each pollutant of concern in each waterbody identified under Section 303(d).  Id. § 1313(d).  A TMDL represents the maximum amount of pollutant "loading" that a waterbody can receive from all combined sources without exceeding applicable water-quality standards.  City of Arcadia v. EPA, 265 F. Supp. 2d 1142, 1144 (N.D. Cal. 2003).  TMDLs are "not self-enforcing, but serve[] as an informational tool or goal for the establishment of further pollution controls."  City of Arcadia, 411 F.3d at 1105.  In California, the North Coast Regional Water Quality Control Board ("Water Board") has developed TMDLs the Scott, Shasta and Salmon Rivers, and a draft TMDL for the Klamath River.[3]  AR 1061.

///

_____

[3] Together, these four rivers cover every stream on the Klamath National Forest.  AR 1061.

5

1       The CWA uses different methods to control pollution released from point sources

2  and nonpoint sources.  Prosolino v. Nastri, 291 F.3d 1123, 1126 (9th Cir. 2002).  Point

3  source pollution is controlled directly by the CWA's federal permit program.  Oregon Nat'l

4  Desert Ass'n v. Dombeck, 172 F.3d 1092, 1096 (9th Cir. 1998).  By contrast, nonpoint

5  source pollution "is not regulated directly by the Act" and is instead left to the States to

6  regulate under state programs.  Id.

7

8     **B.**    **Brief Factual Background[4]**

9

10       In 2005, the Forest Service adopted a final rule governing management of motor

11  vehicle travel within the National Forests ("Travel Management Rule").  70 Fed. Reg.

12  68,264-291 (Nov. 9, 2005).  The Travel Management Rule addresses the need to

13  regulate previously unrestricted motor vehicle travel on the National Forests.  See id. at

14  68,264-65.  This litigation concerns Subpart B of the Travel Management Rule,

15  "Designation of Roads, Trails, and Areas for Motor Vehicle Use."  Subpart B provides for

16  the designation of National Forest System ("NFS") roads, NFS trails, and areas on NFS

17  lands for motor vehicle use by vehicle type and time of year.  36 C.F.R. §§ 212.50-

18  212.57.  The Travel Management Rule requires that, in designating roads, trails, and

19  areas for motor vehicle use, the Forest Service must balance, among other things, the

20  need to protect NFS resources with the need to allow reasonable access for motor

21  vehicles.  Id. § 212.55(a).  Once roads, trails and other areas are designated for motor

22  vehicle use, all motor vehicle uses inconsistent with those designations are prohibited.

23  Id. §§ 212.50(a), 261.13.

24       Currently, the National Forest Transportation System ("NFTS") on the Klamath

25  National Forest consists of approximately 4,536 miles of designated roads.  AR 826.

26  ///

27

28     [4] The facts of this case are, for the most part, undisputed.  In recounting the relevant facts, the
Court cites to the Administrative Record ("AR").

1  The roads that comprise the NFTS were developed in connection with various

2  authorized activities on the Klamath National Forest, such as timber harvest, resource

3  management, fire control and public recreation.  Id. at 602, 826.  The Klamath Forest

4  also contains about 800 miles of roads and trails that are not part of the official NFTS.

5  Id. at 1399.  These "unauthorized" or "user-created" routes have been created by the

6  passage of vehicles over land as visitors have sought access for recreation and other

7  purposes.  Id. at 604, 825.

8  　　　On October 7, 2008, the Forest Service published a Notice of Intent to Prepare an

9  Environmental Impact Statement for the Klamath National Forest Motorized Travel

10  Management ("MTM") project that was intended to implement the 2005 Travel

11  Management Rule.  Id. at 3213-3216.  The public scoping period began on October 7,

12  2008, and ended on December 6, 2008.  The draft environmental impact statement

13  ("DEIS") was published on May 21, 2009.  Id. at 1696.  The Forest Service provided 45

14  days for public comment and then extended the comment period on the DEIS for

15  another 15 days.  Id. at 618.  Additionally, the Forest Service hosted a series of open

16  houses to provide additional information to interested parties and to invite public

17  comments.  Id.  Plaintiffs provided comments on the DEIS.  Id. at 2599, 2715.

18  　　　The Forest Service published the MTM FEIS on January 29, 2010, and again

19  provided for public review and comment, as well as a second series of open houses.  Id.

20  at 619.  The action alternatives considered by the Forest Service in the FEIS ranged

21  from no Forest-wide prohibition on cross-country motorized travel and no changes to the

22  existing NFTS (i.e., leaving the status quo intact) (Alternative 1), to prohibiting cross-

23  country motorized travel, while adding no new routes to the NFTS (Alternative 3), to an

24  action that would have maximized motor vehicle use on the Klamath National Forest

25  (Alternative 5).  Id. at 805-06.  The Forest Service considered comments on the FEIS

26  and responded to those comments in the ROD.

27  ///

28  ///

7

1    On July 29, 2010, the Forest Service adopted the MTM ROD, which implemented

2    the 2005 Travel Management Rule.  Id. at 598-634.  The ROD addresses the need to

3    prohibit unrestricted off-road travel on the Klamath National Forest, while recognizing

4    that many user-created routes are not environmentally damaging and that some are

5    necessary to allow access to remote sites for legitimate recreation opportunities.  Id. at

6    603-604.  The ROD approved a modified version of Alternative 7, which will implement

7    the following actions: (1) prohibiting cross-country travel (i.e., off-road or off-trail) through

8    the 1.7 million acre Klamath National Forest; (2) adding 53 of user-created roads to the

9    NFTS; and (3) adding 20 miles of user-created trails to the NFTS.  AR 608.  The Forest

10   Service will produce a Motor Vehicle Use Map ("MVUM") that will identify all routes open

11   to motor vehicle use.  Id. at 602-03.

12   Plaintiffs timely administratively appealed the ROD in two appeals filed on

13   September 14, 2010, and September 27, 2010.  Id. at 81, 310.  Deputy Regional

14   Forester Ronald Ketter denied Plaintiff's administrative appeals on November 8, 2010.

15   Id. at 7, 10.

16

17                                    **STANDARD**

18       **A. Summary Judgment**

19

20   Summary judgment is appropriate when it is demonstrated that there exists no

21   genuine issue as to any material fact, and that the moving party is entitled to judgment

22   as a matter of law.  Fed. R. Civ. P. 56(c); Karuk Tribe of Cal. v. U.S. Forest Serv., 681

23   F.3d 1006, 1017 (9th Cir. 2012) (en banc).

24   Under summary judgment practice, the moving party

25

26       always bears the initial responsibility of informing the district court of the
         basis of its motion, and identifying those portions of "the pleadings,
         depositions, answers to interrogatories, and admissions on file together
27       with the affidavits, if any," which it believes demonstrate the absence of a
         genuine issue of material fact.

28

1   <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will

2   bear the burden of proof at trial on a dispositive issue, a summary judgment motion may

3   properly be made in reliance solely on the 'pleadings, depositions, answers to

4   interrogatories, and admissions on file.'"  <u>Id.</u> at 324.  Indeed, summary judgment should

5   be entered against a party who fails to make a showing sufficient to establish the

6   existence of an element essential to that party's case, and on which that party will bear

7   the burden of proof at trial.  <u>Id.</u> at 322.  In such a circumstance, summary judgment

8   should be granted "so long as whatever is before the district court demonstrates that the

9   standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  <u>Id.</u> at

10   323.

11           Summary judgment is appropriate in cases, like the present matter, which involve

12   judicial review of administrative action where review is based upon an administrative

13   record.  <u>Karuk Tribe of Cal.</u>, 681 F.3d at 1017.  The court's role in considering summary

14   judgment in this context is not so much to resolve contested questions of fact which may

15   exist in the record; instead, "the court must determine the legal question of whether the

16   agency's action was arbitrary and capricious."  <u>Gilbert Equip. Co., Inc. v. Higgins</u>,

17   709 F. Supp. 1071, 1077 (S.D. Ala. 1989), <u>aff'd</u>, 894 F.2d 412 (11th Cir. 1990); <u>see</u> <u>also</u>

18   <u>Occidental Eng'g Co. v. I.N.S.</u>, 753 F.2d 766, 769 (9th Cir. 1985) (stating the court's role

19   "is to determine whether or not as a matter of law the evidence in the administrative

20   record permitted the agency to make the decision it did").

21

22           **B.**      **APA Standard**

23

24           Plaintiff brings the instant challenges under NEPA, NFMA and CWA pursuant to

25   the APA.[5]

26   _____

            [5] Because NEPA does not contain a separate provision for judicial review, courts review an
27   agency's compliance with NEPA under the APA, 5 U.S.C. § 706(2)(A).  <u>Ka Makani 'O Kohala Ohana Inc.</u>
     <u>v. Water Supply</u>, 295 F.3d 955, 959 (9th Cir. 2002).  Claims raising violations of the NFMA and CWA are
28   also brought pursuant to the APA and governed by the "arbitrary and capricious" standard.  <u>See</u> <u>Greater</u>
     <u>Yellowstone Coalition v. Lewis</u>, 628 F.3d 1143 (2010) (applying the APA's "arbitrary and capricious"

1   Thereunder, the court may set aside a final agency action only where the action is

2   "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the

3   law." 5 U.S.C. § 706. "A decision is arbitrary and capricious if the agency has relied on

4   factors which Congress has not intended it to consider, entirely failed to consider an

5   important aspect of the problem, offered an explanation for its decision that runs counter

6   to the evidence before the agency, or is so implausible that it could not be ascribed to a

7   difference in view or the product of agency expertise." O'Keeffe's, Inc. v. U.S. Consumer

8   Product Safety Comm'n, 92 F.3d 940, 942 (9th Cir. 1996) (quoting Motor Vehicle Mfrs.

9   Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). An agency action is

10  also arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for

11  its action including a 'rational connection between the facts found and the choice made.'"

12  Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.

13      Review under the APA is "searching and careful." Ocean Advocates v. United

14  States Army Corps of Eng'rs, 402 F.3d 846, 858 (9th Cir. 2005). However, the court

15  may not substitute its own judgment for that of the agency. Id. In short, the court must

16  ensure that the agency has taken a "hard look" at the environmental consequences of its

17  proposed action. Oregon Natural Resources Council v. Lowe, 109 F.3d 521, 526 (9th

18  Cir. 1997). As part of this inquiry, the court should ask whether the agency's decision

19  "was based on a consideration of the relevant factors and whether there has been a

20  clear error in judgment." Ocean Advocates, 402 F.3d at 859. In addition, the court

21  determines whether the agency "articulated a rational connection between the facts

22  found and the choice made." Id. at 859 (quoting Arizona Cattle Growers' Ass'n v. United

23  States Fish and Wildlife Serv., 273 F.3d 1229, 1236 (9th Cir. 2001)).

24      In complex cases, "where the agency must comply with a multitude of obligations,

25  many of which pull the agency in competing directions, and which collectively lead to a

26  record of tens of thousands of pages, this standard extends beyond mere deference to

27  the agency's considered judgment.

28  standard to plaintiffs' claims under the NFMA and CWA).

1  The court will additionally overlook minor gaffes in the record." <u>Center for Sierra Nevada</u>

2  <u>Conservation</u>, 832 F. Supp. 2d at 1149.  The court will "uphold a decision of less than

3  ideal clarity if the agency's path may reasonably be discerned." <u>Motor Vehicle Mfrs.</u>

4  <u>Ass'n</u>, 463 U.S. at 43.

5

6                                              **ANALYSIS**

7       **A.       NEPA Claims**

8

9       Plaintiffs make three arguments for why Defendants violated NEPA in the

10  preparation of the MTM ROD and FEIS: (1) the Forest Service failed to consider a

11  reasonable range of alternatives; (2) the Forest Service failed to consider connected,

12  cumulative, and/or similar actions; and (3) the Forest Service failed to disclose

13  environmental information and consequences of the proposed action.  Plaintiffs'

14  Memorandum in Support of Motion for Summary Judgment ("Pls' Mot."), at 14-24.  [ECF

15  No. 25.]  For the reasons stated below, the Court finds that the Forest Service has

16  complied with NEPA provisions in implementing the MTM ROD and thus did not act

17  arbitrary or capriciously.

18

19              **1.       The Forest Service Considered a Reasonable Range of
                            Alternatives**

20

21      Plaintiffs contend that the FEIS runs afoul of NEPA in failing to consider an

22  "alternative that would have reduced the size of the NFTS."  Pls' Mot. at 15.  Plaintiffs

23  argue that, "[i]nstead of considering an alternative that would physically remove routes

24  from the landscape or refrain from designating all existing system routes for motorized

25  use, all of the alternatives analyzed in the FEIS increase the size of the NFTS, and

26  designate motor vehicle use on all of the NFTS roads that were previously open to motor

27  vehicle use."  Pls' Mot. at 16.

28  ///

1   Defendants counter that the MTM ROD and FEIS's consideration of reasonable range of

2   alternatives was adequate under NEPA.  Defendants' Memorandum in Opposition to

3   Plaintiffs' Motion for Summary Judgment and in Support of Defendants' Cross-Motion for

4   Summary Judgment ("Dfts' Opp.") at 10.  [ECF No. 28-1.]

5        In preparing an environmental impact statement ("EIS"), NEPA requires the

6   agency to "study, develop and describe appropriate alternatives to recommended

7   courses of action in any proposal which involved unresolved conflicts concerning

8   alternative uses of available resources."  42 U.S.C. § 4332(2)(E).  The alternatives

9   analysis is the "heart" of an EIS.   Center for Biological Diversity v. U.S. Dep't of Interior,

10  623 F.3d 633, 642 (9th Cir. 2010) (citation omitted).  "The touchstone for [the court's]

11  inquiry is whether an EIS's selection and discussion of alternatives fosters informed

12  decision-making and informed public participation."  Westlands Water Dist. v. U.S. Dep't

13  of Interior, 376 F.3d 853, 868 (9th Cir. 2004).  "The existence of a viable but unexamined

14  alternative renders an environmental impact statement inadequate."  Morongo Band of

15  Mission Indians v. FAA, 161 F.3d 569, 575 (9th Cir. 1998) (internal quotation marks

16  omitted).  However, only feasible alternatives, rather than an infinite range of

17  alternatives, need be considered under the so-called "rule of reason" standard.  City of

18  Carmel-by-the-Sea v. U.S. Dept. of Transp., 123 F.3d 1142, 1155 (9th Cir. 1997).

19  Additionally, the agency does not need to consider alternatives not reasonably related to

20  the project's stated goal and purpose.  League of Wilderness Defenders-Blue Mountains

21  Biodiversity Project v. U.S. Forest Service, 689 F.3d 1060, 1071 (9th Cir. 2012); see also

22  City of Angon v. Hodel, 803 F.2d 1016, 1021 (9th Cir. 1986). ("When the purpose is to

23  accomplish one thing, it makes no sense to consider the alternative ways by which

24  another thing might be achieved.").

25  ///

26  ///

27  ///

28  ///

1   The Forest Service articulated the following four "needs" for the FEIS and ROD: (1) "a

2   need for regulation of unmanaged motor vehicle travel by the public"; (2) "a need for the

3   Klamath Forest Plan to conform to the Travel Management Rule, 36 C.F.R. 212 Subpart

4   B"; (3) "a need for limited changes to the NFTS to . . . provide wheeled motorized access

5   to dispersed recreation opportunities" and "provide a diversity of motorized recreation

6   opportunities"; and (4) "a need for socially compatible use by non-highway-legal vehicles

7   in the vicinity of Hawkinsville where trespass, destruction of private property, and other

8   use conflicts facilitated by the use of [off-highway vehicles] have become a problem."

9   AR 603-05, 829-30.  To achieve the project's stated purposes, the Forest Service

10  analyzed seven alternatives in its MTM FEIS.  Id. at 802-03.  These ranged from no

11  Forest-wide prohibition on cross-country motorized travel and no changes to the existing

12  NFTS (i.e., leaving the status quo intact) (Alternative 1), to prohibiting cross-country

13  motorized travel, while adding no new routes to the NFTS (Alternative 3), to an action

14  that would have maximized motor vehicle use on the Klamath (Alternative 5).  Id.

15      This Court should afford the Forest Service "considerable discretion to define the

16  purpose and need of [its] project."  See Friends of Southeast's Future v. Morrison,

17  153 F.3d 1059, 1066 (9th Cir. 1998).  All seven alternatives considered by the Forest

18  Service in the FEIS were directly related to the MTM project's stated purpose of

19  addressing "unmanaged motor vehicle travel by the public" on the Klamath National

20  Forest.  As Defendants point out, the MTM project does not contemplate removal of any

21  authorized roads from the NFTS.  Dfts' Opp. at 11.  Inclusion of an alternative providing

22  for decommissioning of existing NTFS roads would have greatly expanded the scope

23  and complexity of the MTM project, while not directly addressing the project's stated

24  purpose of dealing with the problem of unmanaged cross-country travel on the Klamath

25  National Forest.

26      A recent decision of the district court for the District of Idaho is instructive.  See

27  Wilderness Society v. U.S. Forest Serv., 850 F. Supp. 2d 1144 (D. Idaho 2012).

28  ///

13

1    In Wilderness Society, environmental groups challenged the Forest Service' s finding of

2   no significant impact ("FONSI") and environmental assessment ("EA") that allowed the

3   agency to designate 1,196 miles of roads and trails in the Sawtooth National Forest for

4   motorized recreational use.  Id. at 1150.  The stated purpose of the FONSI and EA in

5   Wilderness Society, similar to the present case, was "revision of the . . . Travel Plan Map

6   to restrict motor vehicle use to designated roads and trails so as to conform to the 2005

7   Travel Management Rule."  Id. at 1163-64.  The environmental groups argued, inter alia,

8   that the Forest Service violated NEPA by failing to consider "an alternative that reduced

9   motorized route densities in degraded subwatersheds, stabilized and decommissioned

10   non-system routes, prohibited routes in sensitive subwatersheds, and closed specific

11   routes."  Id. at 1163.  The court disagreed and concluded that, in light of the project's

12   limited purpose to restrict motor vehicle use to designated roads and trails, the Forest

13   Service did not have to consider an alternative providing for closure or decommissioning

14   of any existing NFTS routes.  Id. at 1163-64.  The court specifically concluded that "the

15   Forest Service was not required to consider a 'conservation-oriented alternative' as it

16   was not reasonable given the stated purpose of the proposed action."  Id. at 1164.

17          Additionally, the 2005 Travel Management Rule, pursuant to which the Forest

18   Service adopted the ROD, expressly does not require that the Forest Service revisit

19   previous decisions of what roads should be within the NFTS.  See 70 Fed. Reg. 68, 269

20   ("This final rule does not require responsible officials to reconsider decisions authorizing

21   motor vehicle use on NFS roads and NFS trails.").  When the agency takes an action

22   "pursuant to a specific statute, the statutory objectives of the project serve as a guide by

23   which to determine the reasonableness of objectives outlined in an EIS."  Westlands

24   Water Dist., 376 F.3d at 866.  Thus, the Forest Service may shape the project's purpose

25   and need statement according to applicable statutory and regulatory requirements.

26   Inclusion of an alternative contemplating closure or decommissioning of existing NFTS

27   routes would have required the Forest Service to reexamine the entire NFTS system.

28   ///

1    Such a massive undertaking is clearly beyond the MTM ROD's limited scope to address

2    motor vehicle use on unauthorized routes on the Klamath National Forest pursuant to

3    the regulatory requirements of the 2005 Travel Management Rule.

4        Therefore, in light of the stated purpose of the MTM ROD, the Forest Service's

5    decision to limit the scope of the MTM project to addressing motor vehicle use on

6    unauthorized routes was reasonable.  The Forest Service did not act arbitrary or

7    capriciously when it failed to consider closure or decommissioning of existing NFTS

8    routes within the MTM project.

9

10                    **2.    The Forest Service did not Fail to Consider Any Connected or**
                         **Cumulative Actions**

11

12        Plaintiffs argue that the Forest Service violated NEPA by failing to assess the

13   environmental impacts of a connected or cumulative action within the MTM FEIS.[6]  Pls'

14   Mot. at 17-20.  In particular, Plaintiffs assert that the agency should have assessed "the

15   environmental consequences of the entire [NFTS], not just the 73 miles of routes and

16   roads the agency added to the NFTS in the MTM FEIS and ROD."  Id. at 19.

17        NEPA and its implementing regulations direct an agency to include within the

18   scope of its environmental analysis a consideration of "actions" that are "connected,"

19   "cumulative," or "similar."  40 C.F.R. § 1508.25(a).  When two actions are "connected" or

20   "cumulative," an agency must consider both actions in the same environmental impact

21   statement.  Klamath-Siskiyou Wildlands Ctr. v. BLM, 387 F.3d 989, 999 (9th Cir. 2004).

22   ///

23   ///

24   ///

25   ///

26   ───────────────────────
         [6] Although Plaintiffs broadly assert that the Forest Service "failed to consider connected,
27   cumulative, and/or similar actions," Pls' Mot. at 17, Plaintiffs' Memorandum in Support of Motion for
     Summary Judgment does not address what "similar" action the Forest Service failed to consider and does
28   not provide any legal support demonstrating such a failure.  Therefore, the Court limits its analysis to the
     examination of Plaintiffs' argument concerning "connected" and "cumulative" actions.

1

### a.    Connected Actions

2

3      "Connected" actions are actions that: (1) "automatically trigger other actions which

4    may require environmental impact statements"; (2) "[c]annot or will not proceed unless

5    other actions are taken previously or simultaneously"; and (3) "[a]re independent parts of

6    a larger action and depend on the larger action for their justification." 40 C.F.R.

7    § 1508.25(a)(1).  By contrast, "[w]hen one of the projects might reasonably have been

8    completed without the existence of the other, the two projects have independent utility

9    and are not 'connected' for NEPA's purposes."  Great Basin Mine Watch v. Hankins,

10   456 F.3d 955, 969 (9th Cir. 2006).  The purpose of NEPA's "connected actions"

11   requirement is "to prevent an agency from dividing a project into multiple 'actions,' each

12   of which individually has an insignificant environmental impact, but which collectively

13   have a substantial impact."  Id. (citations omitted).

14       Plaintiffs argue that "the 73 miles of routes the Forest Service proposes to add to

15   the NFTS would not exist but for the larger NFTS, to which they are being added . . .

16   [and] would have no 'independent utility' without the NFTS."  Pls' Mot. at 19.  Plaintiffs

17   further argue that "the proposed action is 'inextricably intertwined' with the NFTS"

18   because "there is no indication in the administrative record that the 73 miles of routes

19   proposed for addition to the NFTS would exist in a vacuum without the NFTS to which

20   they connect."  Id. at 20.  Thus, according to Plaintiffs, the MTM project and the existing

21   NTFS are "connected" actions for purposes of NEPA, which triggers the Forest Service's

22   obligation to assess the environmental consequences of both "actions."  Id.  Defendants

23   counter that the "existing infrastructure" is not an action under NEPA, and, therefore,

24   Plaintiffs failed to identify any "action" that would be "connected" to the MTM project.

25   Dfts' Opp. at 14.

26       Under NEPA, federal "action" includes "new or continuing activities . . .; new or

27   revised agency rules, regulations, plans, policies, or procedures; and legislative

28   proposals."  40 C.F.R. § 1508.18(a).

1  Federal actions generally fall within the following categories: "(1) Adoption of official

2  policy"; (2) "Adoption of formal plans"; (3) "Adoption of programs"; and (4) "Approval of

3  specific projects." Id. § 1508.18(b).  In their Reply, Plaintiffs argue that the existing

4  NFTS infrastructure is a "continuing" activity under NEPA and, thus, qualifies as a

5  "connected" action subject to environmental assessment in the FEIS.  Plaintiffs' Reply

6  Memorandum in Support of Motion for Summary Judgment ("Pls' Reply"), at 4-5.  (ECF

7  No. 29.)  Plaintiffs specifically rely on the Ninth Circuit's statement in Upper Snake River

8  Chapter of Trout Unlimited v. Hodel, 921 F.2d 232, 234-235 (9th Cir. 1990), that "if an

9  ongoing project undergoes changes which themselves amount to 'major Federal

10  actions,' the operating agency must prepare an EIS."  Pls' Reply at 5.

11       Contrary to Plaintiffs' assertion, Upper Snake River does not support the

12  conclusion that the existing NFTS system is an "action" for the purposes of NEPA

13  analysis.  In that case, the Ninth Circuit considered whether the Bureau of Reclamation

14  was required to assess environmental impacts of the Bureau's periodic adjustments of

15  water from the dam, which had been constructed before NEPA's enactment.  Upper

16  Snake River, 921 F.2d at 233.  The court concluded that the agency did not have to

17  conduct such an environmental assessment because, inter alia,

18

19       [w]hat [the Federal Defendants] did in prior years and what they were doing
          during the period under consideration were no more than the routine
20       managerial actions regularly carried on from the outset without change.
          They are simply operating the facility in the manner intended.  In short,
21       they are doing nothing new, nor more extensive, nor other than that
          contemplated when the project was first operational.  Its operation is and
22       has been carried on and the consequences have been no different than
          those in years past.

23

24  Id. at 235.  Therefore, the continuous management and operation of the dam did not

25  constitute a "major Federal action," requiring an EIS.  Id. at 235-36.

26       In this case, the Forest Service's continuous operation and management of the

27  NFTS is akin to the Bureau's operation and management of the dam in Upper Snake

28  River.  The NFTS has been in existence for many decades.

1    As Defendants point out, many routes within the NFTS were in existence before the

2    adoption of NEPA, and the Forest Service has been continuously managing and

3    operating the system since then.  See AR 602, 916.  Because an agency "need not

4    discuss the environmental effects of mere continued operation of a facility," Burbank

5    Anti-Noise Group v. Goldschmidt, 623 F.2d 115, 116 (9th Cir. 1980), the Court

6    concludes that the existing NFTS infrastructure is not an action "connected" to the MTP

7    project for NEPA purposes.

8         Plaintiffs also rely on Save the Yaak Committee v. Block, 840 F.2d 714 (9th Cir.

9    1988), and Thomas v. Peterson, 753 F.2d 754 (9th Cir. 1985), to support their claim that

10   the existing NFTS is a "connected action" for NEPA purposes.  Pls' Mot. at 17-20.  Both

11   cases involved the Forest Service's failure to analyze the environmental impacts of a

12   logging road in connection with a proposed timber sale.  See Peterson, 753 F.2d at 757;

13   Save the Yaak Committee, 840 F.2d at 719.  In both cases, the Ninth Circuit held that a

14   road construction for the purpose of facilitating timber sales was an action "connected" to

15   the proposed timber sales and, thus, the Forest Service was required to analyze both

16   "actions" in the same EIS.  See Peterson, 753 F.2d at 758; Save the Yaak Committee,

17   840 F.2d at 720.

18        The Court does not see how Save the Yaak Committee and Peterson are

19   analogous to the situation at issue.  Both of these cases included two specific and

20   concrete projects (construction of a specific road and a specific timber sale project) that

21   could not proceed without each other.  See Peterson, 753 F.2d at 756 ("[I]t is clear that

22   the timber sales cannot proceed without the road, and the road would not be built but for

23   the contemplated timber sales.")  Neither Save the Yaak Committee nor Peterson held

24   that the Forest Service had to examine the environmental impacts of the entire system of

25   existing forest routes in connection with the proposed timber sale project or in

26   connection with the addition of one logging road.  Here, Plaintiffs have pointed to only

27   one specific "action" undertaken by the Forest Service – the MTM project.

28   ///

1   The other alleged "action" - the existing infrastructure of roads and trails on the Klamath

2   Forest - was created long before and independent of the MTM project and thus does not

3   have "a clear nexus" to the MTM project.  See Save the Yaak Comm., 840 F.2d at 720

4   (quoting Peterson, 753 F.2d at 758).

5          As Plaintiffs correctly state, "[t]he purpose of [the connected action] requirement is

6   to prevent an agency from dividing a project into multiple 'actions,' each of which

7   individually has an insignificant environmental impact, but which collectively have a

8   substantial impact."  Pls' Mot. at 17 (quoting Great Basin Mine Watch, 456 F.3d at 969).

9   This "divide and conquer" concern, see Pacific Coast Federation of Fishermen's Ass'n v.

10  Blank, --- F.3d ----, 2012 WL 3892940, at *14 (9th Cir. 2012), is simply not present in

11  here.

12         Therefore, the Forest Service's decision to address the existing NFTS

13  infrastructure as part of the environmental baseline, as opposed to a "connected" action,

14  was not arbitrary, capricious or abuse of discretion.

15

16                    **b.      Cumulative impact**

17

18         With respect to "cumulative" actions, NEPA requires the agency to consider
       the impact on the environment which results from the incremental impact of
19     the action when added to other past, present, and reasonably foreseeable
       future actions regardless of what agency (Federal or non-Federal) or
20     person undertakes such other actions.  Cumulative impacts can result from
       individually minor but collectively significant actions taking place over a
21     period of time.

22  40 C.F.R. § 1508.7.

23         Plaintiffs argue that the Forest Service should have considered the cumulative

24  impact of the existing NFTS and the proposed MTM project because "it would be

25  'irrational, or at least unwise' . . . to consider designating 73 miles of routes as part of the

26  NFTS without continuing to permit motorized use on the preexisting 4,536-mile NFTS."

27  Pls' Mot. at 20.

28  ///

                                        19

1   Plaintiffs' contention here bears a striking resemblance to the argument that the district

2   court for the District of Idaho recently rejected in Idaho Conservation League v. Guzman,

3   766 F.Supp.2d 1056 (D. Idaho 2011).

4       In Guzman, environmental groups challenged the Forest Service's Travel

5   Management Plan for the Salmon–Challis National Forest . Id. at 1059.  Plaintiffs

6   contended that the Forest Service "erred by limiting the analysis of environmental

7   impacts to the 109 miles of newly-designated routes and ignoring the environmental

8   impacts from: (1) on-going use of 783 miles of previously-authorized routes, and (2)

9   on-going effects of the 487.6 miles of motorized routes closed under the Travel Plan."

10  Id. at 1065.  The court disagreed and explained that the Forest Service did not violate

11  NEPA's requirement to analyze cumulative impacts because "the Travel Plan result[ed]

12  in no new routes upon the landscape and actually reduce[d] the total mileage available

13  for motorized use."  Id. at 1066.  Therefore, "it was reasonable for the Forest Service to

14  conclude that the Travel Plan would not result in additive or cumulative impacts to

15  wilderness values and roadless characteristics."  Importantly for the purposes of the

16  cross-motions before this Court, the court in Guzman agreed that the Forest Service's

17  decision to consider the existing infrastructure of forest roads as "the environmental

18  baseline" was reasonable.  Id. at 1065.

19      This Court similarly holds that the Forest Service's decision not to analyze

20  cumulative impacts of the existing NFTS infrastructure was not arbitrary, capricious or

21  abuse of discretion.  The MTM project greatly reduces motorized motor vehicle use on

22  the Klamath National Forest compared to the environmental baseline of the pre-MTM

23  motorized use.  See AR 608 (stating that, under the ROD, cross-country travel would be

24  prohibited on "all 1.7 million acres," while "currently [it is] prohibited on 500,000 acres").

25  The MTM reduces the total amount of routes subject to motorized use by more than 800

26  miles.  The 73 miles of user-created routes that the Forest Service has added to the

27  NFTS as a result of the MTM project already exist on the landscape and "are 'new' only

28  in terms of their official designation" under the MTM project.

20

1   See Guzman, 766 F. Supp. 2d at 1066.  The Forest Service "carefully selected" those

2   routes to achieve the third stated purpose of the MTM project – to provide motorized

3   access to certain dispersed recreational opportunities.  AR 604.

4        Plaintiffs are attempting to expand the limited scope of the MTM project to a level

5   far beyond the purpose and scope reasonably contemplated by the Forest Service.

6   Accepting Plaintiffs' argument would require courts to scrutinize the entire 4,536 mile

7   Klamath NFTS every time the Forest Service proposes a mile-long addition to the

8   existing system.  Therefore, the Court concludes that the Forest Service appropriately

9   analyzed the existing NFTS infrastructure as the "environmental baseline" without

10  analyzing the cumulative impacts of the entire NFTS system.

11

12              **3.     The Forest Service Adequately Disclosed Environmental
                         Information and Consequences of the Proposed Action**
13

14       Plaintiffs argue that the FEIS and ROD "fail to disclose several key pieces of

15  information, which makes assessment of the environmental consequences of the

16  proposed project impossible."  Pls' Mot. at 21.  In particular, Plaintiffs contend that the

17  Forest Service failed to disclose four sources of information: (1) the land use allocations

18  in which the 73 miles of routes added to the NFTS occur, and the corresponding

19  Northwest Forest Plan Standards and Guidelines for those land use allocations; (2) the

20  environmental consequences of the existing NFTS; (3) the NEPA decisions that support

21  the authorization of the existing NFTS; and (4) compliance with the Clean Water Act.  Id.

22  at 20-24.

23       First, Plaintiffs argue that "the FEIS and ROD did not disclose information

24  regarding specific roads and the land use allocation and Key Watershed designations

25  where those roads are located, or the corresponding Standards and Guidelines for each

26  land use allocation or Key Watershed."  Id. at 21.

27  ///

28  ///

1   As a threshold matter, Defendants argue that Plaintiffs have waived this claim by failing

2   to first bring it to the Forest Service's attention during the administrative process and

3   failing to raise it during the public comment process.  Dfts' Opp. at 17.

4          To challenge an administrative decision such as approval of an EIS by an agency,

5   a plaintiff must first exhaust all available administrative remedies required by statute.

6   Darby v. Cisneros, 509 U.S. 137, 146-47 (1993).  Statutes and regulations governing the

7   Forest Service impose an exhaustion requirement on Plaintiffs in challenging the FEIS

8   and ROD.  See Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 965 (9th Cir.

9   2002); Native Ecosystems Council v. Dombeck, 304 F.3d 886, 898-900 (9th Cir. 2002).

10  The Forest Service must have been afforded the opportunity to give any issue raised by

11  Plaintiffs "meaningful consideration" during the administrative process.  Dep't of

12  Transp. v. Pub. Citizen, 541 U.S. 752, 764 (2004).  Therefore, if Plaintiffs failed to raise

13  an issue during the administrative process, they forfeit any objection to an EIS on the

14  basis of that issue.  Id. at 764-65.

15         However, the Ninth Circuit interprets the exhaustion requirement broadly.  See,

16  e.g., Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt., 606 F.3d 1058, 1065

17  (9th Cir. 2010).  During administrative proceedings, a party "need not raise an issue

18  using precise legal formulations, as long as enough clarity is provided that the decision

19  maker understands the issue raised."  Lands Council v. McNair, 629 F.3d 1070, 1076

20  (9th Cir. 2010).  "The plaintiffs have exhausted their administrative appeals if the appeal,

21  taken as a whole, provided sufficient notice to the Forest Service to afford it an

22  opportunity to rectify the violations that the plaintiffs alleged."  Native Ecosystems

23  Council, 304 F.3d at 899.  An argument is not preserved, however, if the connection

24  between the concerns expressed during administrative proceedings and the issues

25  raised in court is "too attenuated."  Great Basin Mine Watch, 456 F.3d at 967.

26  Ultimately, "there is no bright-line standard as to when this requirement has been met[,]

27  and [the court] must consider exhaustion arguments on a case-by-case basis."  Idaho

28  Sporting Cong., 305 F.3d at 965.

1      Review of the administrative record does not support Defendants' contention that

2  the issue now litigated by Plaintiffs is absent from the underlying record.  During the

3  administrative process, Plaintiff Klamath-Siskiyou Wildlands Center ("KS Wild')

4  expressed its concerns about site-specific environmental impacts and site-specific

5  mitigation measures of the proposed MTM project.  See e.g., AR 108, 116-117, 144.

6  Therefore, the issue of whether the FEIS and ROD adequately disclosed site-specific

7  information showing where the proposed routes were physically located on the

8  landscape is properly before the Court.

9      Having found that Plaintiffs satisfied the exhaustion requirement, the Court

10  proceeds to the substantive analysis of Plaintiffs' contention that the Forest Service

11  failed to disclose site-specific information regarding routes in Key Watersheds and other

12  land use allocations or the impact of the MTM ROD in these areas.  See Pls' Mot. at 21.

13      NEPA "requir[es] agencies to take a 'hard look' at how the choices before them

14  affect the environment."  Oregon Natural Desert Ass'n v. Bureau of Land Management,

15  625 F.3d 1092, 1099 (9th Cir. 2010).  This "hard look" requirement mandates a

16  "reasonably thorough discussion of the significant aspects of the probable environmental

17  consequences."  State of Cal. v. Block, 690 F.2d 753, 761 (9th Cir. 1982) (citation

18  omitted).  "[A] reviewing court [must] make a pragmatic judgment whether the EIS's form,

19  content and preparation foster both informed decision-making and informed public

20  participation."  Id.

21      The MTM FEIS states that "[a]bout 60 miles of unauthorized routes [proposed for

22  addition to the NFTS] are located within [riparian reserves] on the west side of the

23  [Klamath National Forest], and 7 miles on the east side."  AR 1089; see also ROD Maps,

24  AR 712-14; FEIS Maps, AR 782-99.  The FEIS discloses the total miles of routes in Key

25  Watersheds and further identifies the individual routes proposed to be added to the

26  NFTS in Key Watersheds.  AR 1064, 1078, 1088, 5543-48.

27  ///

28  ///

1    Additionally, the record contains detailed maps of the unauthorized routes to be added

2    as part of the proposed alternative, see id. at 712-14, and provides sufficient information

3    on the location of the proposed routes in Key Watersheds and Riparian Reserves.  See

4    id. at 1089.  Further, the FEIS describes the associated impacts the additions of these

5    routes may have on the environment.  See, e.g., id. at 1062-78 (discussing

6    environmental consequences of adding routes in Riparian Reserves and Key

7    Watersheds); id. at 1143-54 (discussing impacts to LSR-associated species).  Finally,

8    the FEIS identifies the Standards & Guidelines applicable to both Riparian Reserves and

9    Key Watersheds, as well as other land areas.  See, e.g., id. at 1061-62, 1083-84

10   (disclosing S&Gs applicable to Riparian Reserves and Key Watersheds); id. at 1235

11   (disclosing S&Gs applicable to LSRs).

12        The Court finds that the information disclosed by the Forest Service with respect

13   to site-specific locations of the proposed routes in Key Watersheds and other land use

14   allocations provided Plaintiffs with sufficient information to evaluate the environmental

15   effects of the proposed action.

16        Further, Plaintiffs contend that the Forest Service "failed to disclose and discuss

17   the environmental consequences of the existing, designated National Forest

18   Transportation System" and "failed to disclose the NEPA documentation to support the

19   existing NFTS."  Pls' Mot. at 22.  According to Plaintiffs, "[t]he FEIS fails to explain how

20   the record supports that all 4,536 miles of roads the agency claims are part of the NFTS

21   and available for public use were approved for long-term motor vehicle use pursuant to a

22   valid NEPA process."  Id.  Plaintiffs also argue that the "agency did not provide the public

23   with NEPA decision documents, nor did it establish that routes were exempt from

24   NEPA's requirements."  Id. at 23.  Plaintiffs' criticism is unfounded.

25        As analyzed above, the MTM project does not, and need not to, involve a

26   comprehensive environmental assessment of the entire NFTS.  The ROD's is limited to

27   evaluating whether and to what extent the Forest Service should allow motorized use on

28   previously unauthorized roads on the Klamath Forest.

1    Therefore, the Forest Service did not have an obligation to assess and disclose the

2    environmental impacts of the existing, designated NFTS routes.  Additionally, Plaintiffs

3    have not provided any authority requiring the Forest Service to prove that previous

4    projects within the NFTS were properly approved under NEPA.  As mentioned above,

5    the Travel Management Rule expressly does not require the Forest Service to revisit the

6    NFTS at this point. [7]  See 36 C.F.R. § 212.50(b).

7         Therefore, the Forest Service did not violate NEPA by failing to assess and

8    disclose environmental impacts of the NFTS or by failing to disclose the NEPA

9    documentation to support the existing NFTS.

10        Finally, Plaintiffs contend that "the FEIS and ROD do not disclose how the

11   proposed action complies with the Clean Water Act and all other federal and nonfederal

12   requirements pertaining to water quality."   Pls' Mot. at 23.

13        "Unlike the CWA, NEPA does not require particular environmental standards or

14   mandate that agencies achieve substantive environmental results."  Greater Yellowstone

15   Coal., 628 F.3d at 1150.  All that NEPA requires from the Forest Service is to "inform the

16   public that [the agency] has indeed considered environmental concerns in its

17   decisionmaking process."  Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,

18   462 U.S. 87, 97 (1983) (quotations omitted).  Contrary to Plaintiff's contention, the FEIS

19   contains a detailed analysis of the MTM project's impact on water resources of the

20   Klamath National Forest.  See AR 1060-80.  The Hydrology section of the FEIS analyzes

21   in detail direct and indirect effects of the prohibition of cross-country motor vehicle travel,

22   direct and indirect effects of adding user-created routes to the NFTS, and cumulative

23   effects of the MTM project and other ongoing or foreseeable management projects.  Id.

24   The FEIS also provides a comprehensive alternative-by-alternative discussion of the

25   MTM project's environmental impacts on water resources.  Id. at 1068-76.

26   _____

27   [7] Additionally, NEPA does not require the Forest Service to evaluate the impacts of federal actions completed prior to the passage of NEPA.  See Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275, 1282 (9th Cir. 1973).  As the Forest Service points out, a majority of the NFTS was put into place well

28   before January 1, 1970, when NEPA's obligations became applicable.  See AR 916.  Thus, the Forest Service need not retroactively analyze and disclose the impacts of any decisions made prior to 1970.

1   Further, the FEIS addresses the obligations imposed on the Forest Service by the CWA

2   and other statutes and regulations pertaining to water quality and discloses how the

3   agency will comply with applicable water quality laws in its implementation of the MTM

4   project. Id. at 1060-62, 1078-81. After analyzing the MTM project's impacts on the

5   hydrological resources in the affected areas, the Forest Service reasonably concluded

6   that, by eliminating most off road vehicle access, the ROD would foster better water

7   conditions within the NFTS as a whole and by individual watershed. Id. at 1079.

8        Therefore, the Forest Service has satisfied its duty under NEPA to inform the

9   public on how the proposed action complies with the CWA and other federal and non-

10   federal requirements pertaining to water quality.

11

12        **B.      National Forest Management Act and Northwest Forest Plan**

13

14        Plaintiffs advance four main arguments why the ROD violates provisions of the

15   NFMA and NWFP: (1) the Forest Service violated the NWFP's prohibition on new

16   construction of roads and corresponding expansion of the NFTS in Key Watersheds;

17   (2) the Forest Service violated NWFP S&G WR-3 by improperly relying upon "mitigation"

18   or "planned restoration" as a "substitute for preventing habitat degradation"; (3) the

19   Forest Service failed to designate "unstable and potentially unstable areas" as "Riparian

20   Reserves"; and (4) the ROD fails to comply with the NWFP Aquatic Conservation

21   Strategy ("ACS") objectives for maintenance and restoration of water quality and

22   sediment regime. Pls' Mot. at 24-27.

23        First, Plaintiffs assert that the Standard and Guideline pertaining to Key

24   Watersheds requires the Forest Service to "reduce existing system and nonsystem

25   mileage" and prohibits any "net increase in the amount of roads in Key Watersheds." Id.

26   at 24 (citing AR 18393).

27   ///

28   ///

1    The specific direction from the Klamath LRMP, which includes the "no net

2 increase" provision, explains that "for each mile of new road constructed, at least one

3 mile of road should be decommissioned and priority given to roads that pose the

4 greatest risk to riparian and aquatic ecosystems." S&G 6-24, AR 7328. The Klamath

5 Forest Service interpreted this provision to require that, across all projects undertaken

6 pursuant to the LRMP, any new construction must be offset with a corresponding

7 amount of decommissioning. AR 689. The Forest Service's interpretation of its own

8 LRMP is entitled to deference. League of Wilderness Defenders v. U.S. Forest Serv.,

9 549 F.3d 1211, 1223 (9th Cir. 2008).

10    As a result of the MTM project, the Forest Service has added 6.7 miles of existing

11 unauthorized routes, located in Key Watersheds, to the NFTS.[8] AR 1075. The ROD

12 provides that approximately 100 miles of NFTS roads and 58 miles of user-created

13 routes have been decommissioned since the Klamath LRMP was issued. Id. at 689.

14 Additionally, another 15 miles of roads are scheduled for decommissioning in the near

15 future. Id.

16    To demonstrate that the Forest Service violated its duty to avoid "net increases" in

17 the amount of roads in Key Watersheds, Plaintiffs assert that (1) the Forest Service

18 allegedly admitted that adding unauthorized roads to the Forest Transportation System

19 is considered "new construction," Pls' Mot. at 24 (citing AR 5751); and (2) the Forest

20 Service cannot "'take credit' for historic road remediation in order to comply with [the

21 NWFP]." Pls' Reply at 13. Defendants counter that (1) designating existing user-created

22 roads as NFTS roads does not constitute "new construction" or "net increase" in the

23 amount of roads,[9] Dfts' Opp. at 22; and (2) "new construction may be weighed against

24 prior decommissioning actions," Dfts' Reply at 12.

25 ///

---

26    [8] Plaintiffs assert that the ROD adds 73 miles of routes to the NFTS and that all of those miles are within Key Watersheds. Pls' Mot. at 24. However, according to the administrative record, only 6.7 miles
27 out of the 73 miles added to the NFTS are located in Key Watersheds. AR 1075.
   [9] Defendants point out that AR 5751, on which Plaintiffs rely, applies only to the management of
28 inventoried roadless areas, and not key watersheds. Dfts' Opp. at 22.

1    To resolve whether the Forest Service has violated the NWFP's prohibition on

2   expansion of the NFTS in Key Watersheds, the Court need not decide whether "new

3   construction" includes designating existing unauthorized roads or whether the Forest

4   Service can take credit for historic road decommissioning.  The Forest Service has

5   complied with its obligation even if the Court agrees with Plaintiffs' arguments.  As the

6   administrative record demonstrates, the Forest Service's addition of 6.7 miles of user-

7   created roads in Key Watersheds is sufficiently offset by the agency's undertaking to

8   decommission 15 miles of existing NFTS roads in the near future.  <u>See</u> AR 689.

9    Second, Plaintiffs contend the Forest Service violated NWFP S&G WR-3 by

10   improperly relying upon "mitigation" or "planned restoration" as a "substitute for

11   preventing habitat degradation."  Pls' Mot. at 25.  Plaintiffs maintain that, instead of

12   adopting mitigation measures, the Forest Service was required under the NWFP to

13   "avoid the problem altogether by not designating roads that require mitigation."  <u>Id.</u>

14    NFWP S&G WR-3 and the corresponding Klamath LRMP S&G 10-12 on their

15   face apply only to Riparian Reserves.  <u>See</u> AR 7412, 18445; <u>see also</u> <u>Oregon Natural</u>

16   <u>Resources Council Fund v. Goodman</u>, 505 F.3d 884, 894 (9th Cir. 2007) ("[S&G] WR-3

17   . . . prohibits the Forest Service from 'us[ing] mitigation or planned restoration as a

18   substitute for preventing habitat degradation' within <u>Riparian Reserves</u>.") (emphasis

19   added).  Contrary to Plaintiffs' argument, the FEIS adequately demonstrates that the

20   designation of new routes would not have a negative environmental impact on any

21   terrestrial wildlife species in Riparian Reserves.  As Defendants point out, none of the

22   6.7 miles of routes to be added to the NFTS in Key Watersheds traverse known or

23   historically occupied fish habitat for threatened, endangered, or sensitive fish species.

24   <u>See</u> AR 1088-89.  The National Marine Fisheries Service, with which the Forest Service

25   consulted as required under § 7 of the Endangered Species Act ("ESA"), 16 U.S.C.

26   § 1536, concluded that the proposed action is not expected to have any adverse effect

27   on, and may in fact benefit, terrestrial wildlife species.  <u>Id.</u> at 1179-80, 1183, 1191-94.

28   ///

1    Therefore, the FEIS adequately demonstrates that the MTM project would not cause

2    "habitat degradation" in Riparian Reserves.  In fact, closure of most of the unauthorized

3    routes on the Forest is expected to have an overall beneficial environmental impact on

4    the habitat in the affected areas.  Therefore, the agency's use of mitigation measures did

5    not violate NWFP S&G WR-3.

6         Third, Plaintiffs contend that the NWFP requires that the Forest Service designate

7    "unstable and potentially unstable areas" as "Riparian Reserves" during "project design

8    and implementation."  Pls' Mot. at 25.

9         As a threshold matter, Defendants argue that Plaintiffs waived this argument by

10   not raising it during their comments on the DEIS and FEIS and in the administrative

11   appeal.  Dfts' Mot. at 23.  Plaintiffs counter that they have not forfeited their Riparian

12   Reserves claim because, throughout the public involvement process, Plaintiff KS Wild

13   specifically inquired about protection of steep and unstable areas.  Pls' Reply at 14.  The

14   administrative record demonstrates that KS Wild indeed expressed its concern about

15   routes on steep slopes and erosive soils, routes in unstable areas and sediment

16   production from those routes, and roads in hydrologically sensitive areas.  See AR 117,

17   134, 135, 2638.  However, the record is devoid of any indication that Plaintiffs requested

18   the Forest Service to designate any unstable or potentially unstable areas as Riparian

19   Reserves.

20        As analyzed above, if Plaintiffs failed to raise an issue during the administrative

21   process, they forfeit any objection to an EIS on the basis of that issue.  See Dep't of

22   Transp. v. Pub. Citizen, 541 U.S. at 764-65.  "[P]laintiffs have exhausted their

23   administrative appeals if the appeal, taken as a whole, provided sufficient notice to the

24   Forest Service to afford it an opportunity to rectify the violations that the plaintiff alleged."

25   Native Ecosystems Council, 304 F.3d at 899.

26   ///

27   ///

28   ///

1       In <u>Bark v. Larsen</u>, the district court for the District of Oregon considered whether

2  the plaintiff waived its claim that the Forest Service failed to "undesignate" areas

3  previously designated as Riparian Reserves when the plaintiff's comments submitted to

4  the agency during the administrative proceedings were limited to "general discussion of

5  logging unstable lands within Riparian Reserves." <u>Bark v. Larsen</u>, 2006 WL 4852688, at

6  *2 (D. Or. 2006).  The court found that the plaintiff had not exhausted its administrative

7  remedies with respect to the Riparian Reserves claim because "there is no reasonable

8  basis to expect the Forest Service to understand plaintiff's general discussion of logging

9  unstable lands within Riparian Reserves as a challenge to the agency's previous reserve

10  designations." <u>Id.</u>  The <u>Bark</u> court further explained that, even though the plaintiff "raised

11  certain concerns about . . . logging in unstable areas," "the plaintiff's appeals and

12  comments . . . never used language, precise or general, that would place the Forest

13  Service on notice that plaintiff contested the Forest Service's decision regarding the

14  proper designation of Riparian Reserves." <u>Id.</u>  Thus, "the Forest Service had no reason

15  to suspect that plaintiff's . . . concerns with logging in unstable areas were somehow

16  intended to raise issues regarding the propriety of the previously designated Riparian

17  Reserve boundaries." <u>Id.</u>

18       Here, like in <u>Bark</u>, Plaintiffs' comments communicated to the Forest Service

19  during the administrative proceedings were limited to Plaintiffs' general concerns about

20  designating roads located in unstable or potentially unstable areas.  The record

21  demonstrates that the Forest Service adequately considered these concerns by

22  evaluating routes traversing unstable or potentially unstable areas, and areas containing

23  erodible soils and addressed routes that existed in such locations.  <u>See, e.g.,</u> AR 689,

24  1490, 5222-45.  However, nothing in Plaintiffs' general comments about adding roads in

25  unstable areas put the Forest Service on notice that Plaintiffs sought designation of

26  those areas as Riparian Reserves.

27  ///

28  ///

1   Because Plaintiffs did not provide the Forest Service with "an opportunity to exercise its

2   expertise to resolve [the] claim," see Native Ecosystems Council, 304 F.3d at 899, their

3   Riparian Reserves claim was not properly exhausted and is not subject to judicial review.

4        Finally, Plaintiffs contend that the ROD fails to comply with the NWFP Aquatic

5   Conservation Strategy ("ACS") objectives for maintenance and restoration of water

6   quality and sediment regime.  Pls' Mot. at 26-27.  The nine ACS Objectives were

7   developed "to restore and maintain the ecological health of watersheds and aquatic

8   ecosystems contained within them on public lands."  AR 1061.  Plaintiffs are especially

9   concerned about the Forest Service's compliance with ASC Objectives 4 and 5, which

10  require the Forest Service to "maintain and restore water quality necessary to support

11  healthy riparian, aquatic, and wetlands ecosystems" and "maintain and restore the

12  sediment regime under which aquatic ecosystems evolved."  Pls' Mot. at 26-27 (citing

13  AR 18385).

14       Contrary to Plaintiffs' argument, the administrative record demonstrates that the

15  Forest Service reasonably concluded that the ROD will have the overall effect of

16  reducing sediment delivery, thereby improving water quality in the affected areas.  AR

17  1069-70, 1074-76.  The MTM project is expected to improve existing environmental

18  conditions both forest-wide and by individual watershed.  Id. at 1079.  The Hydrology

19  and Fisheries sections of the FEIS adequately analyze and disclose the impacts of the

20  MTM project on water quality and watersheds.  Id. at AR 1069-70, 1074-76.

21       Further, Biological Assessment, which considered potential impacts of the project

22  on sensitive fish species and species listed under the ESA, determined that the

23  proposed action would have no significant effects, because (1) no new routes are being

24  created; (2) sediment delivery from the areas at issue is negligible, (3) the only perennial

25  stream-crossing proposed to be added to the NFTS is outside coho salmon habitat and

26  will be reinforced and monitored annually for five years; and (4) the closing of vast

27  majority of cross-country routes will have an overall beneficial effect.  Id. at 5370-72.

28  ///

1    The National Marine Fisheries Service also concurred in the Forest Service's

2    assessment.  Id. at 4037-38.  Similarly, the Management Indicator Species Report,

3    which analyzed potential effects on rainbow and steelhead trout, concluded that the

4    effects of the MTM project will be insignificant in the short run and largely beneficial in

5    the long run.  Id. at 5510-12, 1108-1112.  Therefore, the administrative record

6    demonstrates that the Forest Service has complied with the ACS Objectives.

7         As a conclusion, the MTM ROD complies with the Northwest Forest Plan

8    requirements.  Therefore, Plaintiffs failed to demonstrate that the Forest Service's

9    decision to implement the ROD is arbitrary, capricious or abuse of discretion.

10

11   **C.  Clean Water Act**

12

13        Plaintiffs argue that "[t]he Forest Service violated the CWA because it failed to

14   demonstrate that the designation of a 4,600-plus-mile motorized route network system

15   adheres to water quality protections, particularly those provisions related to sediment

16   input."  Pls' Mot. at 28.  Defendants counter that Plaintiffs' CWA claim lacks merit

17   because: (1) Plaintiffs have failed to identify any State laws or regulations pertaining to

18   nonpoint source pollution that the Forest Service violated; and (2) the Forest Service has

19   complied with all applicable CWA requirements and has taken adequate measures to

20   control sediment runoff.  Dfts' Opp. at 27-29.

21        As the Court stated earlier, the CWA's regulatory means differ significantly for

22   point source discharges and nonpoint source pollution.  Pronsolino, 291 F.3d at 1126.

23   The case law suggests, and the parties do not dispute, that the instant action concerns

24   nonpoint source pollution.  See, e.g., Environmental Protection Information Center v.

25   Pacific Lumber Co., 2003 WL 25506817, at * 4 (N.D. Cal. 2003) (stating that runoff from

26   activities inherent to forest management such as "surface drainage," and "road

27   construction and maintenance" is not point source pollution).

28   ///

1    Nonpoint source pollution "is not regulated directly" by the CWA, and is instead left to the

2    States to regulate under state programs.  Oregon Nat'l Desert Ass'n, 172 F.3d at 1096.

3    The State of California has developed TMDLs for three of the four watersheds

4    comprising the Klamath Forest (the Scott, Shasta, and Salmon Rivers), and a draft

5    TMDL for the fourth watershed (the Klamath River).  AR 1061.

6         In support of their argument that the Forest Service violated the CWA, Plaintiffs

7    rely on 40 C.F.R. § 131.12, which, according to Plaintiffs, prohibits the Forest Service to

8    "exacerbate already-degraded [water quality] conditions and contribute to further

9    degradation."  Pls' Mot. at 28.  On its face, the federal antidegradation rule established in

10   § 131.12 applies only to States, and not to federal agencies.  40 C.F.R. § 131.12 ("The

11   State shall develop and adopt a statewide antidegradation policy and identify the

12   methods for implementing such policy pursuant to this subpart.");  see also City of

13   Olmsted Falls, Ohio v. U.S. Environmental Protection Agency, 435 F.3d 632, 637 (6th

14   Cir. 2006) ("In fact, § 131.12 only places obligations on states.  It does not mention any

15   other actor but states.  Corps Defendants cannot be liable for violations of this regulation

16   when they have no obligations under it.").  Additionally, provisions in 40 C.F.R. Part 131

17   merely contain "model water quality standards" to "provide[] States with substantial

18   guidance in the drafting of [their] water quality standards."  Arkansas v. Oklahoma,

19   503 U.S. 91, 101 (1992).  In their CWA claim, Plaintiffs have not identified any California

20   statutes or regulations establishing water quality standards with which the Forest Service

21   failed to comply.  Thus, Plaintiffs' CWA claim fails as a matter of law.

22        Additionally, the administrative record demonstrates that the Forest Service has

23   adequately complied with its obligations under the CWA and that the MTM project would

24   not result in degradation to sediment-impaired waters on the Klamath Forest.  Of the four

25   rivers on the Klamath, only the Scott River has a TMDL for sediment.[10]  AR 18273.

26

27        [10] At the time the Forest Service issued its MTM decision, the Scott River had a TDML for
     temperature and sediment, AR 18273; the Shasta River had a TMDL for dissolved oxygen and
     temperature, id. at 18116; the Salmon River had a TMDL for temperature, id. at 18265; and the Klamath
28   River had no TMDL, id. at 1257.

1   The Scott River implementation plan directed the State Regional Water Board and

2   federal land-management agencies (including the Forest Service) to enter a

3   memorandum of understanding ("MOU") to address, among other things, sediment

4   discharges within the Scott River watershed.  Id. at 18105.  In 2008, the Forest Service

5   and the Water Board entered such a MOU, in which the Forest Service agreed to

6   "prevent or minimize future sediment discharges by implementing the appropriate

7   management practices to meet the BMPs [Best Management Practices] described in

8   Water Quality Management for National Forest System Land in California."  Id. at 18274.

9        The FIES provides that the Forest Service will meet its obligations under the MOU

10   by implementing components of BMP 4-7, which directs the Forest Service to identify

11   routes where off-highway vehicle use could degrade water quality, identify proper

12   mitigation measures to control erosion on these routes, and restrict off-highway vehicle

13   use to designated routes.  Id. at 1060-61, 1078-79, 1110, 14853.  Additionally, all roads

14   designated as NFTS roads under the ROD will be subject to a number of BMPs related

15   to road maintenance and mitigation measures.  See id. at 1060, 1079, 1110.  Those

16   mitigation measures include, among other measures, installation of stream-crossings,

17   BMP-1, id. at 14753, and drainage controls, BMP 2-7, id. at 14757-58.  The FEIS also

18   provides site-specific mitigation measures to minimize sediment associated with addition

19   of user-created routes to the NFTS.  Id. at 1057.  In light of anticipated implementation of

20   these BMPs, the Forest Service reasonably concluded that the MTM decision will cause

21   "reduction to sediment delivery to stream channels."  Id. at 5510.

22        Further, the ROD specifically states that the Forest Service will manage nonpoint

23   source pollution through implementation of the existing TDML action plans for the Scott

24   and Salmon Rivers and the anticipated TMDL for the Klamath River (when such a TDML

25   is adopted).  Id. at 631.  The ROD concludes that the MTM project will "help to achieve

26   the TMDL requirements" "by reducing road density, reducing vehicle-generated

27   sediment, and reducing the potential for sediment delivery to streams."

28   ///

1    Id.; see also id. at 1079 ("Water quality is expected to improve from pre-project

2    conditions, both forest-wide and by individual watershed."); id. at 5511 (effects

3    associated with route additions are "expected to be insignificant in the short term and

4    beneficial in the long term").

5           In their Reply, Plaintiffs also assert that the Forest Service failed to comply with

6    the Water Quality Management Plan contained in the "Water Quality Management for

7    National Forest System Lands in California."  Pls' Reply at 19.  The Water Quality

8    Management Plan states that "system roads will be identified during the transportation

9    planning for decommissioning/ obliteration.  These roads will be analyzed under the

10   NEPA process for removal from the transportation system or downgraded in

11   maintenance level."  AR 14771-72.  Plaintiffs contend that, in violation of the Water

12   Quality Management Plan, the Forest Service "has expressly refused to identify system

13   roads for decommissioning/obliteration during the MTM process, indicating that it has

14   also failed to comply with the Basin Plan."  Pls' Reply at 19.  As analyzed in the NEPA

15   section of this opinion, Plaintiffs improperly attempt to expand the MTM project's scope

16   to require the Forest Service to consider decommissioning existing NFTS routes within

17   the MTM project.  However, pursuant to its stated purpose, the MTM project is limited to

18   addressing motor vehicle use off the NFTS, and not to reexamine whether existing NFS

19   roads currently managed as open to public motor vehicle use should remain open, or be

20   closed or decommissioned. Thus, Plaintiffs contention that the MTM project does not

21   comply with the Water Quality Management Plan fails.

22          Therefore, the Forest Service has complied with the provisions of the CWA in

23   adopting the MTM ROD.

24   ///

25   ///

26   ///

27   ///

28   ///

1

**CONCLUSION**

2

3       The Forest Service did not act arbitrarily and capriciously in its review and

4   approval of the MTM project.  The Forest Service complied with NEPA's procedural

5   requirements by considering a reasonable range of alternatives, by taking a "hard look"

6   at the environmental impacts of the proposed action, and by disclosing the results of its

7   environmental assessment to the public.  The Forest Service also complied with the

8   requirements of the NFMA and CWA.  Therefore, the Court GRANTS Defendants'

9   Motion for Summary Judgment in its entirety, and DENIES Plaintiffs' Motion for

10  Summary Judgment.

11       The Court directs the Clerk of the Court to close the file.

12       IT IS SO ORDERED.

13

Dated:  September 28, 2012

14

15      _____

16      MORRISON C. ENGLAND, JR.
        UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

27

28